UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CAROL J. ASCHERMANN,          )
          Plaintiff,          )
                              )
     vs.                      )          1:08-cv-01510-LJM-DML
                              )
MICHAEL J. ASTRUE,            )
COMMISSIONER OF SOCIAL SECURITY, )
          Defendant.          )

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Carol J. Aschermann ("Aschermann"), by counsel, requests judicial review

of the final decision of defendant, Michael J. Astrue, Commissioner of Social Security

("Commissioner"), denying Aschermann's application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). The Court rules as follows.

**I. BACKGROUND**

**A. PROCEDURAL HISTORY**

On June 29, 2004, Aschermann applied for social security disability benefits. R. at

13. On October 2, 2004, the Commissioner denied her application and on February 9,

2005, denied her application again after reconsideration. R. at 46-54. On April 7, 2005,

Aschermann filed a timely request for hearing, and she appeared and testified at a hearing

held on July 12, 2007, before an administrative law judge (the "ALJ"). R. at 42-43, 634-57.

On January 10, 2008, the ALJ issued a decision denying Aschermann's application for

benefits. R. at 10-23. On September 12, 2008, the Appeals Council denied Aschermann's

request for review. R. at 4-6. Therefore, the ALJ's decision became the final, appealable

decision of the Commissioner.  On November 10, 2008, Aschermann filed the instant action pursuant to 42 U.S.C. § 405(g).

## B.  EMPLOYMENT HISTORY

Aschermann was born on August 29, 1966.  R. at 33.  She was thirty-six years old on the alleged onset date, April 25, 2003, and forty-two years old at the time of the Commissioner's final decision.  R. at 4-6, 15.  She holds a masters degree in social work and was a clinical social worker/psychotherapist from1990-95.  R. at 116.  From 1995-97, she held a marketing position.  *Id.*  She left that field for a sales position in the pharmaceutical industry from 1997-2003.  *Id.*

## C.  MEDICAL HISTORY[1]

On March 26, 2002, Aschermann underwent surgery during which Dr. Rick Sasso ("Dr. Sasso") performed a gill laminectomy,[2] a posterior lumbar fusion,[3] and affixed posterior instrumentation.  R. at 275.  According to Dr. Sasso's report, Aschermann had a

---

[1]  Aschermann does not dispute the ALJ's finding that she lacks a severe mental impairment.  Accordingly, the Court summarizes the portions of Aschermann's medical record relating to her physical impairment.

[2]  "Laminectomy" is defined as "[e]xcision of a vertebral lamina."  STEDMAN'S MEDICAL DICTIONARY 1046 (28th Ed. 1995) ("STEDMAN'S")

[3]  "Lumbar fusion" is defined as "an operative procedure to accomplish bony ankylosis between two or more vertebrae."  STEDMAN'S 780.

history of spondylolisthesis[4] with radiculopathy.[5]  *Id.*  Aschermann failed to respond to nonoperative treatment.  *Id.*  After surgery, Dr. Sasso confirmed spondylolisthesis, with a herniated nucleus.  *Id.*  In addition, Dr. Sasso noted profound instability of L5-S1 and large disk herniation at L5-S1 causing significant left S1 nerve root compromise.  *Id.*  Dr. Sasso discharged Aschermann after three days.  *Id.*

A September 28, 2002, MRI reported normal spinal alignment and normal disc heights, though two discs could not be evaluated.  R.at 279.  On November 6, 2002, a discogram indicated Aschermann's back pain was related to a torn disc and minimal and severe degenerative disk disease in her lower back.  Dr. Kevin E. Macadaeg injected Aschermann in her lower back for pain relief.  R. at 282.

On December 10, 2002, Aschermann began seeing her main treating physician, Dr. Dmitry M. Arbuck ("Dr. Arbuck"), of Meridian Health Group.  R. at 358.  Dr. Sasso referred Aschermann to Dr. Arbuck.  *Id.*  Dr. Arbuck noted facet tenderness on the left and muscle tension on the right.  *Id.*  There was a decrease in extension in the lumbar area and he noted that flexion, though full, increased her pain.  *Id.*  Aschermann had difficulty lifting her legs due to increase of pain in the lumbar area.  *Id.*  The remainder of Dr. Arbuck's testing was unremarkable.  *Id.*  Dr. Arbuck diagnosed degenerative disc disease of the lumbar spine, recurrent major depressive disorder, and left lumbar facet arthropathy.  *Id.*  He

---

[4] "Spondylolisthesis" is defined as "[f]orward movement of the body of one of the lower lumbar verebrae on the vertebra below it, or on the sacrum."  STEDMAN'S 1812.

[5] "Radiculopathy" is defined as "[d]isorder of the spinal nerve roots."  STEDMAN'S 1622.

3

recommended pain and other medication, acupuncture, and injections, and ordered Aschermann to return in one month.  R. at 359-60.

During 2003, Aschermann reported to Dr. Arbuck at lease once a month.  R. at 342-57.  In January 2003, Dr. Arbuck adjusted Aschermann's medication, and by February 2003, Aschermann reported doing "[b]etter than for [seven] years."  R. at 356-57.  Dr. Arbuck increased Ascherman's fentanyl dosage.  R. at 356.  Aschermann felt worse in March.  R. at 355.  Dr. Arbuck increased the fentanyl dosage and added new medications. *Id.*  During Aschermann's second visit in March 2003, she reported a swollen back that was cramping.  R. at 354.  Dr. Arbuck again increased the fentanyl dosage.  *Id.*  On April 22, 2003, Aschermann's pain was better than average; however, Dr. Arbuck noted a poor response to medication.  R. at 353.  Dr. Arbuck also observed sweating, and he prescribed Kadian.  *Id.*  On May 5, 2003, Dr. Arbuck noted that Aschermann wanted to go on short term disability.  R. at 352.  She requested one week off of work.  *Id.*  Later that month, Dr. Arbuck ascertained poor pain control and he changed Aschermann's medications to include trileptal and skelaxin.  R. at 351.  Aschermann was on short-term disability at the time.  *Id.*

On June 18, 2003, Aschermann reported back to Dr. Sasso for the first time since December 2002.  R. at 390.  She rated the intensity of her lower back pain an eight on a scale of ten.  R. at 402.  AP and lateral radiographs of Aschermann's lumbar spine were performed.  R. at 390.  Those tests showed that the instrumentation was intact and that the spondylolisthesis at L5-S1 had not progressed.  *Id.*  Overall, the tests "looked extremely good."  R. at 390.  Dr. Sasso raised the possibility of another fusion surgery.  *Id.*

On June 26, 2003, Aschermann returned to Dr. Arbuck's office for a follow-up evaluation.  R. at 350.  Dr. Arbuck noted that a facet injection helped Aschermann's pain,

4

although he increased her medication.  *Id.*  In July 2003, Aschermann received more facet injections, and engaged in physical therapy three times a week.  R. at 349.  In August 2003, Aschermann's pain levels were not better.  R. at 347.  On September 9, 2003, Dr. Arbuck increased Aschermann's Kadian dosage, even though it made here "more tired."  R. at 348.  Aschermann reported that physical therapy helped relieve her symptoms.  *Id.*  In October 2003, Dr. Arbuck again increased Aschermann's Kadian dosage, noting that Aschermann's pain was "intractable."[6]  R. at 345-46.  She began to limp.  R. at 345.  In November 2003, although her limp was gone, Aschermann reported increased pain with physical exertion of any length of time and poor coping.  R. at 343-44.  Dr. Arbuck noted tenderness, tension, and trigger points.  R. at 343.  Finally, in December 2003, Aschermann reported that she was sedated or slept when she took her prescribed medication, although her nausea was manageable.  R. at 342.  Dr. Arbuck reported tenderness, misalignment, and trigger points in his "muscoloskeletal" evaluation.  *Id.*

During 2004, Aschermann continued her attempt to relieve her back pain.  On January 2, 2004, Shane J. Rose ("Dr. Rose") performed a two-level lumbar discography of Aschermann's lower back.  R. at 391.  A post-discogram CT of Aschermann's lumbar spine identified mild to moderate L4-5 disc derangement with posterior extension along an annular tear.  R. at 393.  The L5-S1 disc was not completely visible to due the instrumentation placed in Aschermann's lower back in 2002.  *Id.*

Aschermann continued her regular appointments with Dr. Arbuck during 2004, although on multiple occasions, instead of seeing Dr. Arbuck, Aschermann visited

---

[6] "Intractable" is defined as "[r]esistant to treatment."  STEDMAN'S 993, 1664.

physician's assistants employed by Meridian Health Group.  In January 2004, Aschermann reported to Dr. Arbuck for a follow-up visit.  R. at 341.  Ashermann told Dr. Arbuck that she wanted to go home to lay on the floor.  *Id.*  Dr. Arbuck noted that Aschermann had a discography performed on her back.  *Id.*  He opined that Aschermann's pain was "prolonged acute rather than chronic pain."  *Id.*

On February 4, 2004, Aschermann reported back to Dr. Sasso, her first visit to him since June 18, 2003.  R. at 375.  She reported "horrible incapacitating back pain . .. at the lumbosacral junction" and "extreme difficulty with her activities of daily living due to her pain."  *Id.*  Dr. Sasso observed that the January 2004 discography showed a positive discogram at L5-S1 with 10/10 concordant pain.  *Id.*  Dr. Sasso's assessment of the cause of Aschermann's pain was pseudoarthrosis[7] L5-S1.  *Id.*  He recommended continued nonoperative treatment as opposed to another fusion surgery.  *Id.*  However, Aschermann "wishe[d] to proceed . . . due to her significant functional incapacity."  *Id.*  Therefore, their plan was to proceed with anterior lumbar interbody fusion.  R. at 389.  On February 18, 2004, Aschermann saw Dr. Sasso and reported a pain level of seven out of ten.  R. at 385, 401.  Dr. Sasso made findings similar to the findings he made on February 4, 2004.  R. at 385.

On February 12, 2004, Aschermann sought a second opinion from Dr. James Hardacker ("Dr. Hardacker").  R. at 289-92.  Dr. Hardacker noted a significant possibility of pseudoarthrosis.  R. at 291.  He thought there might be a lack of bilateral posterolateral fusion as well.  *Id.*  He recommended additional testing, including a bone scan and an

---

[7] "Pseudoarthrosis" is defined as "[a] new, false joint arising at the site of an ununited fracture."  STEDMAN'S 1586, 1588.

updated MRI, to allow him further assessment.  *Id.*  Based upon the information given to him at that point, he suggested that it was not unreasonable to reexplore the fusion mass and remove the hardware if it was solid.  R. at 292.  If not, he would strongly consider reinstrumentation.  *Id.*  He was uncertain about the proper course of treatment for the L4-5 level.  *Id.*

On March 2, 2004, Aschermann sought a third opinion from Dr. Robert Huler ("Dr. Huler").  R. at 398.  Dr. Huler diagnosed "postoperative back pain.  Differential diagnoses includes failure of spinal fusion versus adjacent segment breakdown of the lumbar 4-5 facet joint."  *Id.*  Dr. Huler suspected that either the 2002 fusion failed or that there was an adjacent breakdown of the lumbar L4-5 facet joint.  *Id.*  He suggested an ultra thin sectioned CT scan.  *Id.*  In addition, he recommended a dedicated lumbar 4-5 facet block to see if the degenerative facets could be included as a pain generator.  *Id.*  On March 3, 2004, an MRI showed abnormal appearance of the L5-S1 intervertebral disc with significant marrow edema surrounding the disc space changes, as well as degenerative disc disease at L4-5, "incompletely evaluated secondary to artifact."  R. at 301.

On March 8, 2004, Aschermann returned to Dr. Arbuck's office for a follow-up.  R. at 340.  Dr. Arbuck stated that he would try another round of facet injections before he considering a possible anterior fusion.  *Id.*  He reduced the Kadian dosage even though it effectively reduced Aschermann's pain.  *Id.*  In April 2004, Dr. Arbuck noted tenderness and increased spasms, and Aschermann complained of confusion and sedation.  R. at 339-40.

On May 12, 2004, Aschermann saw orthopedist Dr. Terry R. Trammell ("Dr. Trammell").  R. at 370-71.  Dr. Trammell admitted Aschermann's case was "somewhat difficult to sort out."  R. at 370.  He noted Aschermann's continued back pain after her 2002

7

fusion.  R. at 370.  He found Aschermann to be in mild pain with no acute distress and observed Aschermann had "pretty good range of motion" in her back.  R. at 370.  He stated that "Pseudoarthrosis remain[ed] unproven," and recommended that Aschermann obtain a fine cut CT scan, as Dr. Huler did, to determine whether she had any fusion bone in the lateral gutters.  R. at 370-71.  Ultimately, Dr. Trammell believed "at least a component of [Aschermann's pain wa]s secondary to the pseudoarthrotic changes at the lumbosacral level and Modic changes [we]re hot on [a] bone scan at L5-S1."  R. at 371.  Therefore, he preferred the anterior surgical approach to address the pseudoarthritis, although he doubted it would completely alleviate her pain.  *Id.*

A May 2004 CT showed mild disc space narrowing with mild to moderate facet joint degeneration at L4-5 and mild spondylolistheses and moderately advanced disc collapse at L5-S1.  R. at 321.  On June 22, 2004, Aschermann underwent a lumbar discography and CT study.  R. at 317-20.  The CT revealed an annular tear at one level, but the discogram was negative.  *Id.*  Upon review of these tests, Dr. Trammell recommended surgery, although he admitted he did not expect Aschermann to get more than fifty percent relief of her complaints of back pain.  R. at 311.  In August and September 2004, Aschermann generally rated her pain from five to eight out of ten in intensity.  R. at 183-88.

In September 2004, Aschermann saw state agency consultant Dr. Wail Bakdash ("Dr. Bakdash") in relation to her DIB application.  R. at 252-55.  Dr. Bakdash reported normal gait and posture, tenderness of the spine, and a lack of swelling.  *Id.*  In addition, Dr. Bakdash noted Aschermann was able to grasp, lift, carry, and manipulate objects in both hands, and perform repeated movements with both feet.  *Id.*  Moreover, she was able to bend over without restriction and squat normally.  *Id.*  Finally, Aschermann was able to

8

sit, stand, and walk normally.  *Id.*  Dr. Bakdash did not reference Aschermann's pending November 2004 surgery, or the tests that led up to the surgery.

On October 2, 2004, Dr. R. Fife ("Dr. Fife"), reviewed Aschermann's file and completed a functional capacity form.  R. at 231-37.  Dr. Fife opined that Aschermann could: (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand/walk about six hours in a work day; (3) sit about six out of eight hours; (4) occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; (5) never climb ladders, ropes, or scaffolds; and (6) not have concentrated exposure to wetness, vibration, hazards, avoiding slippery and uneven surfaces.  *Id.*  Dr. Fife did not discuss the potential sedative effects of Aschermann's medication.  R. at 231.  He also failed to mention Aschermann's pending surgery date and did not consider the opinions of any of Aschermann's treating physicians. R. at 236.

On November 2, 2004, Drs. Trammell and Lary Stevens ("Dr. Stevens") performed a two-level anterior fusion procedure.  R. at 202.  Post-surgical x-rays showed normal alignment of the spine in the lower back.  R. at 217, 222.  Dr. Trammell ordered acquatic therapy, which Aschermann began in November 2004 with positive results.  R. at 1761, 196.  Approximately one month after the surgery, Aschermann reported to Dr. Trammell that her pain was five out of ten, and had not exceeded seven out of ten.  R. at 191.  Dr. Trammell described a "usual amount of post[-]operative pain, swelling, and discomfort." *Id.*  Aschermann's condition "appear[ed] to be improving."  R. at 192.

On January 27, 2005, another state agency physician, Dr. F. Lavallo ("Dr. Lavallo"), stamped Dr. Fife's October 2004 residual functional capacity ("RFC") assessment, stating "I have reviewed all the evidence in [the] file and the RFC is affirmed as written."  R. at 230-

37.  That same day, Dr. Lavallo apparently completed another RFC assessment in light of Aschermann's November 2004 surgery.  R. at 134.  In the portion of the assessment that reads "RFC ASSESSMENT IS FOR[,]" Dr. Lavallo put "Date 12 Months After Onset: 11-01-2006."  R. at 134.  In the assessment, Dr. Lavallo noted Aschemann's November 2004 surgery and December 15, 2004, follow-up with Dr. Trammell.  R. at 135-36.  He acknowledged Aschermann took "a large amount of pain medication."  R. at 136.  In addition, Dr. Lavallo discussed whether the severity of Aschermann's symptoms and their alleged effect on function were consistent with the total medical and nonmedical evidence:

> The claimant's allegations and contentions regarding the nature and severity of the impairment related symptoms, as well as the functional limitations imposed by these symptoms[,] are found to be fully credible because they are reasonably well supported by appropriate medical findings and are not inconsistent with the overall evidence in [the] file.

R. at 139.  Ultimately, Dr. Lavallo affirmed Dr. Fife's original RFC determination.  R. at 142.

Aschermann continued to see Dr. Arbuck or a physician's assistant in 2005.  On January 31, 2005, Aschermann reported she had reduced pain and she moved better.  R. at 533.  She told Dr. Arbuck that laying down and stretching helped the pain, which ranged in intensity from five out of ten to eight out of ten.  R. at 534.  In multiple visits to Meridian Health Group from February  through July, Aschermann rated her pain from four out of ten to seven out of ten, described herself as "more active," and reported that she was doing Pilates and aquatherapy.  R. at 520-31.  At one point she wanted to cut the medication that made her sleepy so she could return to work.  R. at 526.

On April 27, 2005, Dr. Trammell examined Aschermann during a follow-up visit.  R. at 538-540.  Aschermann complained of intermittent back pain related to activity. R. at 538.  Aschermann explained that her back pain was twenty percent better than it was before the

10

November 2004 surgery.  *Id.*  Her pain was mild to moderate.  *Id.*  Aschermann felt less

pain when laying down.  R. at 539.  Dr. Trammell observed that Aschermann's condition

"appear[ed] to be improving," and that an x-ray of the lumbar area showed a stable fusion

R. at 539.  Finally, Dr. Trammell advised Aschermann to continue Pilates and to fully

resume her normal routines so long as she avoided bending and twisting at the same time.

R. at 540.

In a July 2005 visit with Dr. Arbuck, Aschermann reported upper body tingling, with

tenderness and tension in her lower back.  R. at 521.  She also reported severe tiredness,

for which Dr. Arbuck prescribed a stimulant.  *Id.*  However, he could not cut her narcotics.

*Id.*  On July 13, 2005, Dr. Arbuck wrote to Aschermann's social security application

representative, diagnosing degenerative disc disease, lumbar facet arthropathy, sacroilitis

and sciatica.  R. at 518.  He stated Aschermann's condition was chronic and not relieved

by surgery, injections, physical therapy, or medication.  *Id.*  In addition, he instructed the

representative that Aschermann's pain prevented her from gainful employment in her

occupation.  *Id.*  Finally, Dr. Arbuck told the representative that Aschermann's condition

would not improve without a new treatment option becoming available.  *Id.*

In visits to Meridian Health Group from July through October 2005, Plaintiff rated her

pain as ranging from four out of ten to eight out of ten, though she rated it at nine on one

occasion.  R. at 457-62, 519.  Through this time, Aschermann continued to take narcotic

pain killers.  *Id.*

In 2006, Dr. Arbuck examined Aschermann eight times–once each in May, August,

September, and December, and four times in November.  R. at 487, 504-16.  Up to

November, Aschermann rated her pain as ranging from six to eight out of ten twice, and exactly five out of ten once.  R. at 487, 514-16.

In a September 28, 2006, letter to Aschermann's insurance carrier, Dr. Arbuck wrote that Aschermann had intractable pain, and that her pain and functioning were poorly controlled.  R. at 547.  He indicated that her narcotics treatment caused complications, including gastroparesis, and that he planned to rotate her to Suboxone.  *Id.*  According to Dr. Arbuck, Aschermann "continue[d] to exhibit significant sedation, fatigue, nausea, dizziness and mental cloudiness due to medications."  *Id.*  She also continued to exhibit "functional impairment with limitation in ability to move and be upright for sufficient periods of time."  *Id.*  Aschermann had difficulty sitting for longer than twenty to thirty minutes at a time, and needed to rest in a reclined position for most of the day.  *Id.*  In fact, "any upright posture, including sitting, exacerbates pain and causes increase in pain level to uncontrollable degree."  *Id.*  Dr. Arbuck did not anticipate improvement in Aschermann's condition until new advances in surgical and instrumentation treatment became available. *Id.*

In November 2006, Aschermann reported to Dr. Arbuck that her pain ranged from six to ten on two occasions and from zero to two on two occasions.  R. at 504-13.  She began taking Suboxone during this time and immediately saw improvement  R. at 506, 513, 653.  However, Aschermann had bouts of nausea and dizziness in response.  R. at 50.  On December 4, 2006, Aschermann reported to Dr. Arbuck that the Suboxone was "really working," but that she had experienced nausea and bad bouts of constipation.  R. at 505. Her back pain continued to improve in February and March 2007, but she told Dr. Arbuck

that she still tired easily and needed to lie down.  R. at 500-03.  She also continued to complain about nausea caused by her medication.  R. at 500-01.

On May 1, 2007, Dr. Robert Gould ("Dr. Gould"), who works at the Meridian Health Group, examined Aschermann.   R. at 496-97.   Dr. Gould's report indicated that Aschermann's pain level was generally two or three out of ten, and that she had a mild to moderate level of debilitation.  R. at 296-97.  He recommended a continuation of suboxone and physical therapy to work on stabilization of her back.  R. at 497.


### D.  ALJ HEARING

On July 12, 2007, Aschermann, in person and by counsel, appeared for a hearing on her application before the ALJ.  R. at 634.  Aschermann testified during the hearing.  She explained that she suffered from "a lot of [back] pain," as well as side effects from her medication.  R. at 638.  According to Aschermann, her pain began to interfere with her functioning in 2001 and became worse after her second surgery.  R. at 643-44, 649. Aschermann testified that she spent most of her day in bed and spent less than three hours per day on her feet.  R. at 645, 651-52.  After two or three hours of standing, she strongly felt the need to lie down.  R. at 654.  Although her mother helped with her chores and shopped for her, Aschermann drove and went to the grocery store on her own.  R. at 645-46, 648, 652, 654.

Aschermann testified she began taking Suboxone in November 2006, which eliminated her pain for periods of time.  R. at 650.  However, Suboxone gave her "a lot of nausea," which became "constant" after about three months.  *Id.*  In addition to Suboxone, Aschermann explained that she had previously taken Kadian, which made her very sleepy.

13

R. at 650-51.  Kadian also gave her nausea.  R. at 651.  She testified that she stopped taking Suboxone, and rated her pain at four or five out of ten when she sat still.  R. at 653.

Stephanie Archer ("Archer"), a vocational expert, also testified.  R. at 655-57.  Archer testified that Aschermann's prior work as a psychotherapist was classified as sedentary and skilled.  R. at 655. Her work as a pharmaceutical sales rep was light and skilled.  *Id.*  Finally, her marketing position was sedentary and skilled.  *Id.*  Archer testified that a hypothetical person with Aschermann's vocational background who could (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand/walk for two hours total; (3) sit for six hours, with the option to alternate positions at will for one to two minutes; (4) not bend, squad, or climb stairs or ramps more than occasionally; (5) not kneel, crawl, walk on uneven ground, or climb ladders, ropes or scaffolds; (6) not operate a motor vehicle, work around hazards, large bodies of water or open flames, or be exposed to extremes of temperature or humidity; and (7) do only simple and repetitive work, could nonetheless do a full range of unskilled sedentary work, including general office clerks, machine tenders, inspectors, packers, and assemblers.  R. at 655-56.  However, when asked by the ALJ whether the same person could find employment with the added qualification that the person, because of pain or fatigue, would need to lay down thirty to sixty minutes in addition to the normal fifteen minute breaks and the lunch time break, Archer testified that all work would be eliminated.  R. at 656-67.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423.  "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A).  In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.    If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.    If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's

15

findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.*  While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However,  the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

### A.  THE ALJ'S FINDINGS

Initially, the ALJ noted Aschermann met the insured status requirements of the Social Security Act through December 31, 2008.  R. at 15.  At step one of the sequential analysis, the ALJ concluded that Aschermann had not engaged in substantial gainful activity since April 25, 2003, the alleged onset date. *Id.*  At step two, the ALJ determined that

16

Aschermann had a severe impairment, namely degenerative disc disease.  *Id.*  However, at step three the ALJ determined that Aschermann did not have an impairment or combination of impairments that met or medically equaled one of the impairments specified in the Listing of Impairments.  R. at 16.

Between the third and fourth steps, the ALJ determined that Aschermann had the RFC to perform light work, except that she could only lift and carry twenty pounds occasionally and ten pounds frequently.  *Id.*  In addition, he determined Aschermann could sit for six hours during an eight-hour work day; however, she must be allowed to alternate between sitting and standing at will for periods of one to two minutes per hour.  *Id.*  The ALJ determined that Aschermann was restricted from kneeling, crawling, and climbing ladders, ropes, and scaffolds, and that she should not walk on uneven surfaces.  *Id.*  Likewise, Aschermann had to avoid work at unprotected heights and around dangerous machinery, operating a motor vehicle, or being around open flames or large bodies of water.  *Id.*  Finally, he determined that Aschermann's work should be simple and repetitive in nature.  *Id.*

At step four, the ALJ concluded that Aschermann was unable to perform her past relevant work.  R. at 21.  Finally, at step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Aschermann could perform.  *Id.*  Accordingly, Aschermann was not disabled.  R. at 22.

## B.  ASCHERMANN'S ARGUMENTS ON APPEAL

Aschermann asserts essentially three reasons why the ALJ's decision is not supported by substantial evidence.  However, the Court need only consider the first.

Ultimately, Aschermann argues that the ALJ did not give proper weight to her treating physician, Dr. Arbuck.  Specifically, Aschermann cites Dr. Arbuck's July 13, 2005, and September 28, 2006, opinion letters.  R. at 518, 547.  In those opinion letters, after describing Aschermann's physical impairments and symptoms, Dr. Arbuck opined that Aschermann's condition is chronic in nature and not expected to improve until new advances in surgical and instrumentation treatment become available.  *Id.*

The Commissioner argues that the ALJ's decision is supported by the opinions of the state agency physicians, Drs. Lavallo, Fife, and Bakdash.  In his decision, the ALJ stated he "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p."  R. at 16-17.  The ALJ concluded:

> As for opinion evidence, I give great weight to the State Agency medical opinion discussed above as it is consistent with the overall evidence and rendered by persons who are well-qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to medical severity.  The State Agency opinion is well supported by the objective medical evidence and accepted as an accurate representation of the claimant's physical status.

R. at 21.  Therefore, the ALJ declined to give Dr. Arbuck's opinions controlling weight.

The Court concludes that the ALJ did not properly explain his decision for affording Dr. Arbuck's opinion less weight than the state agency physicians' opinions.  "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008)).  An ALJ must offer "good reasons" for the amount of weight he chooses to afford a

18

medical opinion.  20 C.F.R. § 404.1527(d)(2); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).  Here, however, the ALJ failed to apply the factors listed in § 404.1527(d)(2) with respect to Dr. Arbuck's opinions.  R. at 19.  In fact, he does not even mention Dr. Arbuck's July 2005 opinion letter.  As to Dr. Arbuck's September 2006 letter, the ALJ's only written response was that the letter was written "prior to [Aschermann] starting on Suboxone."  R. at 19.  This explanation, and the ALJ's decision overall, fails to comply with 20 C.F.R. § 404.1527(d)(2).

Moreover, the state agency opinions upon which the ALJ relied do not provide substantial evidence in support of his decision.  Dr. Bakdash's September 22, 2004, opinion and Dr. Fife's October 2, 2004, RFC assessment occurred just before Aschermann's November 2, 2004, back surgery.  R. at 231-37, 252-53.  Yet, neither physician discussed the back surgery that was scheduled to occur just weeks after their determinations, nor did they discuss Aschermann treating physicians' notes and assessments leading up to surgery.  In addition, Dr. Fife failed to discuss the potential sedative effects of Aschermann's medication and did not consider the opinions of any of Aschermann's treating physicians.  R. at 231, 236.

Likewise, the Commissioner improperly places great weight on the opinion of Dr. Lavallo.  The ALJ thought Dr. Lavallo made his RFC assessment on November 1, 2006.  In fact, Dr. Lavallo made this assessment on January 27, 2005, which was nearly two years before the ALJ thought Dr. Lavallo made it, two and one half years before the ALJ hearing, and three years before the ALJ's decision.  This was an understandable mistake.  In the portion of the assessment that reads "RFC ASSESSMENT IS FOR[,]" Dr. Lavallo put "Date 12 Months After Onset: 11-01-2006."  R. at 134.  The ALJ's confusion becomes critical when

19

considering the effect the ALJ's mistake has on the relevant time line of Aschermann's medical history .  R. at 19.  According to the ALJ's version of the events, Dr. Arbuck opined that Aschermann suffered pain to an "uncontrollable degree" on September 28, 2006.  R. at 19.  However, the ALJ thought that on November 1, 2006, just weeks after Dr. Arbuck's opinion, "the State Agency concluded again that Ms. Aschermann could perform work at the light level of exertion."  R. at 19.  Although the ALJ did not expressly state that the agency's so-called November 1, 2006, report undercut Dr. Arbuck's September 2006 opinion letter, it is reasonably fair to infer the ALJ followed that reasoning.  At the very least, the Court concludes it should remand this case so the ALJ can further explain the discrepancy regarding the date on Dr. Lavallo's RFC assessment.

Finally, the Court notes that the ALJ placed great emphasis on Aschermann's success with the prescription drug Suboxone.  For example, in explaining why "the record overall does not support a disabling physical impairment, the ALJ noted that Aschermann's condition "improved greatly with Suboxone medication."  R. at 20.  Likewise, the ALJ noted that in 2007, Aschermann rated her pain a two or three on a scale of one to ten.  *Id.*  She made those ratings while taking Suboxone.  R. at 497.  However, at her hearing before the ALJ, Aschermann testified she no longer took Suboxone due to, at least in part, constant nausea.  R. at 650, 653-54.  The ALJ did not discuss how, if at all, his decision would be different if Aschermann did not get the pain relief she experienced from Suboxone.  Because the ALJ cited Aschermann's success with Suboxone as a reason why the overall record did not support a disabling physical impairment, on remand the ALJ should consider Aschermann's decision to not take the drug.

In summary, the Court concludes that the ALJ's decision is not supported by substantial evidence.   Therefore, the Court does not need to address Aschermann's remaining arguments.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the final decision of the Commissioner of the Social Security Administration in this case is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

IT IS SO ORDERED this 1st day of February, 2010.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

21

Distribution to:

Ronald B. Eskin
reskin52@hotmail.com

Richard A. Gole
GOLE & VANWINKLE P.C.
rgole2467@aol.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov